IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| James Stephon McDowell a/k/a<br>James S. McDowell, #332105,<br><br>       Plaintiff,<br><br>v.<br><br>Carol E. Mitchell-Hamilton, John B.<br>Tomarchio, Tianna R. Randolph,<br>Robert M. Stevenson, III, T. Montgomery,<br>Bryan Sterling and Evelyn Barber, Head<br>Food Supervisor,<br><br>       Defendants. | CIVIL ACTION NO. 9:14-2132-BHH-BM<br><br><br>**REPORT AND RECOMMENDATION** |

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983. Plaintiff, an inmate with the South Carolina Department of Corrections (SCDC), alleges violations of his constitutional rights by the named Defendants.

The Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. on January 23, 2015. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on January 26, 2015, advising Plaintiff of the importance of a dispositive motion and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case. After receiving an extension of time to file a response, Plaintiff filed a memorandum in opposition,



- 1 -

with attached exhibits, on March 30, 2015.[1]

Defendants' motion is now before the Court for disposition.[2]

### Background and Evidence

Plaintiff alleges in his verified First Amended Complaint[3] that on May 31, 2012, while he was incarcerated in the SMU[4] at the Broad River Correctional Institution (BCI), he informed an unknown officer on the night shift that he was "light headed, vomiting, jittery, short of breath, and felt overheated". Plaintiff alleges that after about five minutes, "Lt. Harvin" came to find out what was going on, and that Harvin witnessed him vomit twice. Plaintiff alleges that Harvin then called medical, and that after about five minutes two officers arrived to take him to medical, where he was seen by Nurse Takishah Smith. Smith asked Plaintiff why he had a towel around his shoulders, and he informed her that he used a wet towel to help keep him cool. Plaintiff alleges that after he explained to Nurse Smith what was going on, she checked his vitals and placed him on the oxygen tank. Plaintiff alleges that Smith informed him that he "wasn't getting enough oxygen to [his] brain", at which time Plaintiff went "into a state of paranoia . . . .". Plaintiff alleges that after

---

[1]Although Plaintiff had complained in several letters filed with the Court that he was being denied access to the prison law library and otherwise hindered in his ability to respond to the Defendants' motion, the Court notes that Plaintiff's response in opposition totals 430 pages.

[2]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed a motion for summary judgment. As this motion is dispositive, this Report and Recommendation is entered for review by the Court.

[3]In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the factual allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

[4]Special Management Unit.



he was "able to come down" he was given Phenergan, Tylenol, and a shot of Vistoril and sent back to his cell.

Plaintiff alleges that since May 31, 2012, he has been seeking medical attention for a variety of issues through Staff Member Requests, sick call requests, as well as through the inmate grievance system, but while some of his requests have been answered, others have been disregarded. Plaintiff alleges that on June 9, 2012 he notified an Officer "Jones" that he had been passing "black stools" and asked him to call medical. Jones later told the Plaintiff that medical said someone would be sent over to see him, and that he would check back with medical once he had completed his rounds. Plaintiff alleges he told Jones that he was having sharp pains in his stomach and "real bad burning", and Jones said he would let medical know and asked Plaintiff if he wanted some Maalox. Plaintiff said yes, and Jones returned a short time later with a bottle of Maalox. Plaintiff alleges that, when a few hours later no one from medical had yet come to see him, he "beat on [his] cell door to get an officer to my door". When an officer arrived, Plaintiff informed him that he was in pain and asked to see a sergeant or lieutenant. Plaintiff alleges that the officer told him that he would call and left.

Plaintiff alleges that after waiting a "short while" to see if someone was going to come, he could "no longer bear the pain and the burning" so he " popped the sprinkler" inside his cell. Plaintiff alleges that a few seconds later Sergeant "Williams" showed up to find out what was going on, and Plaintiff told him that he had been vomiting and showed him a "black stool" that he had saved. Plaintiff alleges that Williams then left to call medical, and "a while later" Williams came back with "Nurse Brooks". Plaintiff was then taken to medical for an examination, during which he told Nurse Brooks about having been seen on May 31, 2012 and inquired whether that



– 3 –

could be causing the problem.  Plaintiff alleges that Nurse Brooks then performed several tests and gave him some medications for the burning in his stomach and for his vomiting.  Plaintiff was advised to contact medical if he got any worse, and was sent back to his cell.

Plaintiff alleges that the following day he was still having stomach pains and burning, and that he would get real light headed and dizzy after a bowel movement.  Plaintiff alleges that he informed the officer (Lt. "Johnson"), who had Plaintiff placed in the holding cell until the nurse could come to see him.  Plaintiff also asked for some Maalox, which Johnson got for him.  After about forty-five minutes, Plaintiff was seen by Nurse Robert Kingsbury.  Plaintiff alleges that Kingsbury examined him and said that he would forward Plaintiff's complaints to Dr. John Tomarchio (one of the named Defendants in this case).  In the meantime, Kingsbury told Plaintiff to keep taking his medications and to not eat three hours before going to bed.

Plaintiff alleges that on July 30, 2012, he submitted a Request to Staff Member form asking to be seen in sick call about the "burning" he was experiencing after eating.  Plaintiff speculated that this might be being caused by his mental health medication.  Plaintiff alleges he never heard back from this request, so on August 1, 2012 he submitted another Request to Staff Member form requesting a full physical.  Plaintiff alleges he got a response to this request on September 7, 2012, stating that it was up to the doctor to decide whether he needed a physical.

Plaintiff alleges that on August 4, 2012 he was seen in the SMU sick call by Nurse Rainey.  Plaintiff speculated that he might have a stomach ulcer.  Rainey informed him that she would forward a message to the doctor, and that in the meantime he should stay away from spicy foods and caffeine.  Plaintiff alleges that on August 7, 2012 he complained to Nurse Johnson that he was having burning in his stomach and throat, but that he never heard anything back from



medical. On August 8, 2012, Plaintiff submitted another Request to Staff Member form, this time to the dietician asking them about the food possibly being responsible for making his stomach hurt. Plaintiff alleges that he informed the dietician that he needed to stay away from spicy foods, and that this type of food needed to be replaced with something "good for my body". Plaintiff alleges he got a response to this Request to Staff form indicating that Plaintiff had been seen at sick call on August 4, 2012, and that nothing had been mentioned about Plaintiff being on a special diet, although they would put Plaintiff on the list for sick call to address this issue.

Plaintiff alleges that on August 24, 2012, he submitted a Request to Staff Member form to Dr. Tomarchio requesting to be seen about weight loss and about being placed on a special diet. Plaintiff alleges that he never got a response back to this request form, and that on September 27, 2012 he submitted another Request to Staff form to the doctor's office, but was informed by an unidentified officer that they do not forward requests written in pencil.

Plaintiff alleges that on September 30, 2012 he was seen in sick call by Nurse "Rainey" for complaints of vomiting and soreness in his stomach, and was informed not to eat certain foods and to drink Maalox as needed. Plaintiff told Nurse Rainey that he thought he should be on a special diet, and Rainey said that she would forward this message to the doctor. Plaintiff alleges that at this time he could only eat "rice and bread". Plaintiff alleges that on November 8, 2012, he submitted a grievance stating that he needed immediate attention for his condition, and asking that he be placed on "some vitamins and [a] healthy diet and have [a] physical examination . . . .". Plaintiff alleges that this grievance was denied.

Plaintiff alleges that on December 11, 2012 he was seen in sick call by the Defendant Tianna Randolph, a nurse. Plaintiff alleges that he informed Nurse Randolph that he believed he had



a stomach ulcer.  Plaintiff states that "at this point in time I was on [a] hunger strike" because everything he would eat "would not stay down".  Plaintiff alleges that Randolph told him she would forward a message to the doctor about these issues and sent him back to his cell.

Plaintiff alleges that on January 8, 2013, he was seen in the mental health clinic by Patrick Carter for his monthly mental health review, at which time Plaintiff informed Carter that he had not been taking any of his mental health medications due to having severe stomach pains and other medical problems which Plaintiff attributed to his mental health medication (Neurotin).  Plaintiff alleges that Carter placed a call to medical, and was informed that Plaintiff had a doctor's appointment coming up with Dr. Tomarchio.  Plaintiff alleges that later that day he was seen on sick call by Nurse Randolph, at which time he requested that Randolph have his Zantac changed to Prilosec because his aunt had told him it would help him with his stomach problems.  Plaintiff alleges that Randolph said she would forward this matter to the doctor, but that he was never seen by Dr. Tomarchio.

Plaintiff that on January 12, 2013 he was taken to sick call to have his weight checked.  Plaintiff alleges he weighed 143 pounds.[5]  Plaintiff alleges that he was told by Nurse Rainey to keep taking his stomach medications and Maalox as needed, and to stay away from spicy foods as well as items such as chocolate and citrus.  Plaintiff alleges that he was ordered placed on a "weekly weight" program, which was ordered by the Defendant Nurse Practitioner Mitchell-Hamilton.  Plaintiff alleges that on January 19 he weighed 144 pounds, on January 26 he weighed

---

[5]Plaintiff had earlier alleged that he had at one time weighed as much as 163 pounds.  <u>See</u> <u>First Amended Complaint</u>, ¶ 26.

– 6 –



143 pounds, and on February 2, he weighed 138 pounds.[6]  Plaintiff alleges that on February 6, 2013

he submitted another Request to Staff Member form asking to be seen by the doctor, and stating that

he had dropped from 163 pounds to 138 pounds.  Plaintiff wanted to be placed on some vitamins,

and also wanted a "full body physical" and some blood tests.  Plaintiff alleges he got a response back

to this request on September 12, 2013, stating that he had been seen by the doctor on June 18, 2013

(four months after he had sent his request), and that he had still never received a "full body" physical.

Plaintiff alleges that although prison regulations require a physical examination every two years for

inmates younger than forty-nine years old, he had not received a physical examination in five years.

Plaintiff alleges that on March 14, 2013 he was seen in sick call by Nurse "Green",

where he was still complaining of stomach pain.  Plaintiff alleges that he told Green that he was on

Prilouse and Zantac, but that these medications were not helping, and that he was having to drink

a lot of Maalox to help with the burning and pain in his stomach.  Plaintiff asked to have testing done

for a stomach ulcer.  Plaintiff alleges that Nurse Green informed him that she would forward a

message to the Defendant Mitchell-Hamilton for further review.  Plaintiff alleges that he was then

seen again in sick call on April 23, 2013, noted that he had been seen for the same problem and

complaints for "almost a full year", and inquired why he had never been sent for a GI testing.

Plaintiff alleges that he was thereafter seen for a followup on June 11, 2013 by Nurse "Jackson",

who on examination noted tenderness around Plaintiff's navel.  Plaintiff alleges that he was again

informed that his concerns were regularly being forwarded to the physician.

Plaintiff alleges that on June 15, 2013 he informed a correctional officer that he was

---

[6]Plaintiff alleges that back in August of 2012, his weight had dropped to 100 pounds.  <u>First Amended Complaint</u>, ¶ 34.



having stomach pains, burning in his stomach and shortness of breath.  The officer called medical and was instructed by the Nurse to give Plaintiff some Maalox and have him lie down.  Plaintiff alleges that he informed the correctional officer that the Maalox "ain't gone help me" and that he wanted to be seen by medical.  Plaintiff alleges the officer came back about ten to fifteen minutes later and told him that he could sign a refusal to not take Maalox, but that a Nurse "Brooks" indicated Plaintiff was not going to be seen at that time.  Plaintiff was seen again on June 18, 2013 by the Defendant Mitchell-Hamilton for complaints of pain and extreme burning in his stomach as well as vomiting and weight loss.  Plaintiff alleges that Mitchell-Hamilton performed an examination and, while noting that his stomach was tender to the touch, informed him that his stomach "sounded good", and that she wanted to run some tests on his glucose levels.  She also told Plaintiff she would forward a message to set him up for an appointment with a gastroenterologist, to which Plaintiff responded that she should have done that a long time ago.  Plaintiff alleges that he weighed 139 pounds at that time.

Plaintiff alleges that on July 16, 2013 he was ordered to report to medical for a doctor's visit, where he was seen by the Defendant Mitchell-Hamilton about the tests that had been run on his glucose levels.  Plaintiff complained that he was still having problems with this stomach, and that Mitchell-Hamilton informed him that gastrointestinal testing takes time.  Plaintiff alleges she also informed him she was putting him on Zofran for his vomiting, and that he was to keep taking his Prilosec.  Plaintiff alleges that he was thereafter seen by a gastroenterolgist (Dr. "Chockalingam") on August 30, 2013, who on examination noted tenderness around Plaintiff's navel and on the upper left hand side of his stomach.  Plaintiff alleges that Dr. Chockalingam told him that he would be scheduled for testing.



Plaintiff alleges that on September 13, 2013 he was seen in the SMU lockup by "Kenya Rainey" for complaints of dizziness and vomiting. Plaintiff complained that the Prilosec was making his stomach hurt, and he was told to take this medication thirty minutes to an hour before meals and not to eat fried, fatty, or spicy food or other prohibited foods or condiments. Plaintiff was again advised that his complaints would be provided to the doctor.

Plaintiff alleges that on October 3, 2013 he was sent to an outside appointment for an endoscopy and upper GI testing, which was performed by Dr. Chockalingam. Plaintiff alleges that Dr. Chockalingam informed him that he had inflamation in his stomach. Plaintiff alleges he did some checking on his own when he got back to the prison to learn about this condition, and although he wrote to Berkeley Endoscopy (where his GI procedure had been performed) to get more information about this illness, he never got a response. Plaintiff alleges that he was thereafter seen in the SMU lockup sick call by the Defendant Nurse Randolph on October 29, 2013, but that when he asked her if she could check or find out about his test results, she informed him that she had no knowledge about his gastrointernal testing. Plaintiff alleges that he also asked to be placed on "Tunisi", but that he never received this medication.

Plaintiff alleges that on November 17, 2013, he was found by Officer "Johnson" lying on his cell floor next to a pool of vomit. Plaintiff alleges that he would not speak because the pain was "too much", and that when Officer Johnson asked him if it was his stomach again, he nodded yes. Plaintiff alleges that medical was notified, and that Officer Johnson would also walk by and check on him "from time to time". Plaintiff alleges he stayed on the floor in his cell until the nurse came for the pill line, but that she only left him his mental health medication. Plaintiff also alleges that when he had a bowel movement he also had blood in his stool. Plaintiff alleges that when he



asked the officer to check on his medical request, he found out that the reason medical had not come was because they had been told that he was just having stomach pains and that it was not an emergency. Plaintiff alleges that when he asked a different officer to inform medical that he was passing blood in his stool, that medical responded that he needed to sign up for sick call. Plaintiff alleges that he then informed the officer on duty ("Deloch") to get him a sergeant or lieutenant, and that he "then flooded my cell knowing that this would get" the sergeant or lieutenant to his cell faster.

Plaintiff alleges that a "Lt. Walker" then came to his cell and Plaintiff showed him his bloody stool. Plaintiff alleges that Walker then called medical and told them that Plaintiff needed to be seen, but that medical's response was again that Plaintiff needed to sign up for sick call in order to be seen. Plaintiff alleges he told Walker that "medical will see me and if they don't I will make them see me one way or another." Plaintiff alleges that he then showed Walker two pieces of razor blade and informed Walker that if medical did not see him he would swallow the razors, and that he then in fact did swallow one razor "to show him I wasn't joking". Plaintiff alleges that when medical still would not come, he swallowed another razor. Plaintiff alleges that he was then "stripped out" and placed in a lock up cell with a camera on him at all times. Plaintiff alleges that Walker told him that it was the Defendant Nurse Randolph who "kept denying me medical attention".

Plaintiff alleges that on November 18, 2013 he informed Nurse "Linhardt" that he was "real sick and passing blood in my stool". Plaintiff alleges he was advised that they were "monitoring the situation". Plaintiff also alleges that he learned that, with respect to his request to be seen by medical on November 17, 2013, the Defendant Nurse Randolph had reported on



November 18, 2013 to Tonya Hill, who was "on call mental health", that Plaintiff was "acting out due to wanting to be seen by medical" and that Plaintiff had stated he had swallowed a razor blade. Plaintiff alleges that he also learned that when mental health had asked if he needed to be sent to the hospital, the Defendant Nurse Randolph had said no per orders of the Defendant Mitchell-Hamilton, and that mental health had then agreed to place Plaintiff on crisis intervention status in a stripped out cell with a camera.

Plaintiff alleges that when the mental health counselor came to see him on November 19, 2013, he was told that if he did not feel like he wanted to hurt himself that he would be given all of his property back and removed from the stripped out cell. Plaintiff alleges that he told the mental health counselor that he was "straight", but that he still needed to be seen by medical for passing blood. Plaintiff alleges that that same day, he completed a Request to Staff form stating that the burning and pain in his stomach had gotten worse, and that he wanted to be tested for a stomach infection. Plaintiff also complained in that Request to Staff form about how well the food trays were being cleaned, and that that could cause a stomach infection. Plaintiff alleges he received a response stating that he had been scheduled to be seen in the nurses clinic.

Plaintiff alleges that on November 20, 2013 he informed Officer "Gipson" that he needed to be seen by medical for stomach pain and burning and vomiting, and that Gipson was told by Nurse Randolph to have Plaintiff sign up for sick call. Plaintiff alleges that he told the "Sgt" that if he was not seen he would hang himself. The "Sgt." then call "Lt. Harvin" to come see what was going on, and Plaintiff informed Harvin that he was having problems with his stomach again and was being denied medical treatment. Plaintiff alleges that Harvin then called medical and that the Defendant Nurse Randolph told him to have Plaintiff sign up for sick call. Plaintiff alleges that that

- 11 -



same day he also submitted a Request to Staff Member form to the Assistant Warden ("Sutton") about being told to sign up for sick call, and that Randolph had refused to see him. Plaintiff alleges that Sutton checked with medical and was told that Plaintiff was scheduled for a gastrointestinal followup. The next day, November 21, 2013, Plaintiff was seen in sick call by Nurse "Bates". Plaintiff alleges that Bates performed a series of tests and also inspected his bloody stool sample and told Plaintiff that he would "get with the doctor about these issues ASAP".

Plaintiff alleges that on December 4, 2013 he went to the doctor's clinic and was seen by the Defendant Mitchell-Hamilton, who informed him that he had "chronic gastritis". Plaintiff alleges he asked if he needed to be placed on antibiotics, and was told no, that he should just watch what he ate and keep taking his stomach medication, which was increased. Plaintiff alleges that he was thereafter seen again by Dr. Chockalingam on January 8, 2014. Plaintiff alleges that he told Dr. Chockalingam that he had been having pain in his stomach and lower back on the left side and asked to be placed on something to help him gain weight, but that Dr. Chockalingam "preferred me to have multi-vitamins and if that didn't help he would place me on some boost pudding or ensure plus to gain weight".

Plaintiff alleges that on February 3, 2014 he submitted a Request to Staff form complaining that he had not yet gotten his multi-vitamins because they were being sold at the canteen and he could not buy them at the canteen since he was on lockup. Plaintiff alleges he got a response back from Ms. "Hill" on April 3, 2014 telling him he needed to forward all of his concern to his mental health counselor.

Plaintiff alleges that on February 4, 2014 he was seen in sick call by the Defendant Randolph about his weight loss and about his instructions from Dr. Chockalingam, and that



Randolph told him that she would "inform the doctor". Plaintiff alleges that he was thereafter sent back to Berkeley Endoscopy on February 6, 2014 for a colonoscopy, which apparently (according to Plaintiff's allegations) determined that he had internal hemorrhoids.

Plaintiff alleges that on February 25, 2014 he submitted a sick call request asking to be seen and to also be placed on "double portions" of food to help with his stomach, but that he never received what he asked for. Plaintiff alleges that same day he also submitted a Request to Staff Member form to the Defendant Mitchell-Hamilton asking that she forward his nutritional information and requirements to the "kitchen supervisors" so they would "replace [his] foods with something I can eat". Plaintiff alleges this was necessary so that he would no longer be denied meals by the Defendant Head Food Supervisor Evelyn Barber and her staff. Plaintiff alleges, however, that this information was not forwarded to the food supervisors and therefore he continued to be denied food that he could eat. Plaintiff alleges that, according to SCDC regulations, all inmates who have chronic diseases are supposed to be monitored on a regular basis by health services staff, and that therapeutic diets are supposed to be ordered in accordance with what is documented in the medical records. Plaintiff also alleges that inmates 49 years or younger are supposed to have physical examinations every two years, but that he had "never received one" since December 2008.

Plaintiff alleges that on February 25, 2014, he submitted a grievance form stating that he had been denied food due to being given food on his food tray that he could not eat, and that he also submitted a Request to Staff that day to Food Supervisor "Williams" asking why he had been denied another food tray. Plaintiff alleges he got a response stating that he was only allergic to egg products and that they were therefore only going to remove egg products from his food tray unless he got something from medical saying he was allergic to other food products. Plaintiff alleges that

- 13 -



he then sent a Request to Staff Member form to the Defendant Warden Stevenson on March 6, 2014 complaining about his food service, and that he had to go from regular meals to a "veg/meal" because he could not eat the food on the regular tray due to it being "greasy" and "saucy". Plaintiff also complained to the Defendant Stevenson about the medical care he had been receiving. Plaintiff alleges he filed another grievance form on March 8, 2014 about his medical care, as well as a Request to Staff Member form directed to the Defendant Bryan Sterling (Director of the SCDC) complaining about his medical care and the type of food he was being provided. Plaintiff alleges he submitted another Request to Staff Member form on March 9, 2014 to Assistant Warden Sutton with these same complaints, as well as a sick call request asking to be seen by medical for his chronic gastritis and internal hemorrhoids. Plaintiff complained in the sick call request that his Prilosec pills were not working while the antacid he had only worked an hour and "thats all". Plaintiff again asked to be placed on Tumisi. Plaintiff alleges, however, that he "never received nothing for my health issues".

Plaintiff alleges that on March 16, 2014 he submitted a Request to Staff Member form to the Defendant Mitchell-Hamilton complaining about his medical issues, as well as another Request to Staff Member form on March 19, 2014 to Head Nurse "Smith" complaining about some medications he was receiving and that he was out of some of his pills. Plaintiff alleges he received a response indicating what his prescribed daily dosage was and that he was not to "overdose yourself".

Plaintiff alleges that the Defendants have been deliberately indifferent to his serious medical needs, and asks for monetary damages, as well as certain declaratory and/or injunctive relief. Plaintiff has attached seventy-eight pages of exhibits to his Complaint, consisting of SCDC Health



Services Medical Summaries, Request to Staff Member forms, copies of sick call requests, copies of Inmate Grievance forms, copies of some forms and documents from the Berkeley Endoscopy Center, copies of some pathology reports, and copies of some information about gastric diseases that were apparently printed off the internet. <u>See generally</u>, <u>Plaintiff's First Amended Complaint</u>, with attached Exhibits.

In support of summary judgment in this case, the Defendant John Tomarchio has submitted an affidavit wherein he attests that during the time period relevant to Plaintiff's complaints he was a physician with the South Carolina Department of Corrections. Dr. Tomarchio has attached copies of Plaintiff's SCDC medical records to his affidavit as Exhibits A1 and A2. Tomarchio attests that when Plaintiff entered the SCDC on December 8, 2008, he received a full physical examination. Plaintiff's weight was 144 pounds, he reported that he was allergic to eggs and penicillin, and that he had a history of PTSD, ADHD, bipolar disorder, anxiety and panic attacks.

Tomarchio attests that on May 31, 2012, Plaintiff complained that he was feeling hot, shaking, nauseous, and light headed. Tomarchio attests (and Plaintiff's medical records confirm) that Plaintiff stated he felt like that when he was having a panic attack, and admitted that he was stressed. Plaintiff had thrown his psych medications in the toilet because he did not want to take them. Plaintiff was examined by a nurse; he was given oxygen, Tylenol and Phenergan, and the on call doctor ordered that he be given a shot of Vistaril. Tomarchio attests that later that same day Plaintiff complained about having another attack where he felt shaky, nervous, nauseated and real hot, as well as that he had been vomiting and could not take his medications. Plaintiff was again examined by a nurse, and he was also assessed by a mental health counselor, who noted Plaintiff was having a panic attack and notified a psychiatrist. Dr. Tomarchio attests that he was called and he



ordered that Plaintiff receive a liquid diet for twenty-four hours and that he be given Ativan or Vistaril along with Phenergan. However, because Ativan and Vistaril were not available, he ordered that Plaintiff be given Phenergan only. See also Medical Records (Encounter No. 224).

Dr. Tomarchio attests that on June 5, 2012 a nurse reported to the SMU to assess the Plaintiff because he said he was having a panic attack. Plaintiff was found to be in no acute distress, mental health was notified, and Plaintiff was instructed to try to eliminate the stressors that were causing his anxiety episodes. See also Medical Records (Encounter No. 228). Tomarchio attests that on June 9, 2012 Plaintiff reported that he was short of breath, throwing up, and had black stool. Plaintiff also said that he had gastric reflux that was not relieved by Maalox, that Phenergan had helped, and that he had been on Zantac in the past. At that time Plaintiff weighed 150 pounds. The nurse believed that Plaintiff had symptomatic GERD and GI distress, was given Zantac, and was instructed to decrease his intake of certain foods. Tomarchio attests that he reviewed this Encounter Note and told the nurse to instruct Plaintiff to return if his symptoms persisted or worsened. See also Medical Records (Encounter No. 229).

Tomarchio attests that the following day Plaintiff complained of pain on the left side of his abdomen, black stools, throwing up, and that he was light headed and dizzy after a bowel movement. Plaintiff was examined by a nurse, who noted that he had left side tenderness to palpation. Plaintiff agreed to take some Ibuprofen for pain and to report any foods that caused him heartburn. It was also noted that Plaintiff had not taken the medications previously given to him, and he was instructed by the nurse to take his medications as ordered or to give them back to the pill nurse. Tomarchio attests that he reviewed these encounter notes and ordered some blood work. See also Medical Records (Encounter No. 230). The following day, June 11, 2012, Plaintiff told his

- 16 -



mental health counselor that he had "popped a sprinkler" to get medical attention.  Plaintiff told his mental health counselor that when he has panic attacks and anxiety his stomach gets tight and contributes to his problems.  Tomarchio attests that he reviewed these mental health encounter notes. <u>See</u> <u>also</u> Medical Records (Encounter No. 231).

Tomarchio attests that around two months later, on August 4, 2012, Plaintiff complained about a burning sensation in his chest and inability to breathe, that he had vomited the night before, and that antacids were not helping him.  Plaintiff also complained that he thought he had a stomach ulcer.  On examination the nurse found Plaintiff to have tenderness in his right and left upper quadrants, and he was again instructed on what foods he should be avoiding.  <u>See</u> <u>also</u> Medical Records (Encounter No. 238).[7]  Tomarchio attests that on August 7, 2012 Plaintiff requested more Zantac because Plaintiff said it was helping his stomach, so he wrote Plaintiff another prescription for Zantac.  <u>See</u> <u>also</u> Medical Records (Encounter No. 241).  Tomarchio attests that during this time period Plaintiff did not complain to any medical staff or to his mental health counselors about weight loss or about the food he was eating, and in fact told his mental health counselor on September 13, 2012 that he was doing fine and not experiencing any problems.  <u>See</u> <u>also</u> Medical Records (Encounter No. 246).

Tomarchio attests that on September 30, 2012, Plaintiff reported to sick call complaining of a sour stomach and that he would throw up after drinking milk and orange juice.  Plaintiff's weight at that time was 144 pounds.  Plaintiff requested a change to his diet and wanted

---

[7]Tomarchio attests that although Plaintiff's weight is purported as 100 pounds in this encounter note, this is most likely a typo since he had a reported weight of 150 pounds on June 9, 2012.  <u>See</u> (Encounter No. 229).



peanut butter on his tray in the morning. Plaintiff was examined by the nurse, was instructed to request antacids from the correctional officers when his stomach was sour, and was again told not to eat acidic or spicy foods. The nurse also forwarded this Encounter Note to Dr. Tomarchio, who ordered a followup in three months if Plaintiff's symptoms persisted, and to use conservative measures if GERD was suspected. See also Medical Records (Encounter No. 253).

Tomarchio attests that on October 11, 2012 Plaintiff told a nurse that he was allergic to mushrooms, which were causing a rash in his mouth, and when it was noted that Plaintiff's medical records did not contain any reported allergies to mushrooms, Plaintiff stated that he had not told the medical staff about his mushroom allergy. Dr. Tomarchio attests that he instructed the nurse to ask Plaintiff to provide any outside documentation about a mushroom allergy. See also Medical Records (Encounter No. 258). The following day, Plaintiff told a mental health counselor that he had intentionally been given mushrooms in his Nutraloaf meal that had caused him to break out. However, cafeteria staff told the correctional officers that the Nutraloaf meal did not have mushrooms. See also Medical Records (Encounter No. 259).

Dr. Tomarchio attests that around two months later, on December 11, 2012, Plaintiff complained about having stomach ulcers that were diagnosed before he came to prison. Plaintiff was on a "hunger strike" at that time (although it was noted on that date that he weighed 148 pounds). Plaintiff complained that his stomach was burning and he was throwing up, but on examination Nurse Randolph found nothing abnormal. Nurse Practitioner Mitchell-Hamilton ordered a followup visit to evaluate the stomach problem. See also Medical Records (Encounter No. 269).

On January 8, 2013, Plaintiff reported to his mental health counselor that, other than Neurontin, he was not taking his psych medications. As for the Neurontin, Plaintiff complained that



it was causing multiple side effects including abdominal pain, blurred vision, dry mouth, constipation, nervousness, dizziness, vomiting and nausea, shortness of breath, and weight loss, all of which were coincidentally listed in a pamphlet about Neurontin and its side effects that Plaintiff had in his possession. The mental health counselor contacted medical to get a doctor's appointment for the Plaintiff, and Plaintiff was thereafter examined that same day by Nurse Randolph about his stomach complaints as well as complaints about athletes foot. Plaintiff weighed 143 pounds at this time. Nurse Randolph forwarded her consultation notes to a doctor for review. See also Medical Records (Encounter Nos. 272 and 273).

Plaintiff was next examined by Nurse Practitioner Mitchell-Hamilton in the doctor's clinic on January 10, 2013 regarding his various complaints.[8] Mitchell-Hamilton ordered some lab work, prescribed Plaintiff some Prilosec (instead of Zantac) as well as Imodium and Phenergan, and instructed that he have weekly weight checks for one month. See also Medical Records (Encounter Nos. 274 and 275). Tomarchio attests that when Plaintiff next saw a psychiatrist on January 14, 2013, he had deliberately not taken some of his medications so that he could see which ones had side effects, and that he had in his possession an internet printout on the side effects of Neurontin. The psychiatrist told Plaintiff that if he did not take his medications, they could be discontinued, and specifically that if his Neurontin was discontinued it could not be restarted. The Encounter Note indicates that Plaintiff did not want any of his medications discontinued. See also Medical Records (Encounter No. 276).

───────────

[8]Even though Plaintiff weighed 144 pounds in September 2012, and was noted on January 12, 2013 to weigh 143 pounds, Plaintiff complained during this visit that he had lost twenty pounds in five months. See (Encounter Nos. 253, 275).



Between January 19, 2013 and February 2, 2013, Plaintiff's weight fluctuated between 138 and 144 pounds. See also Medical Records (Encounter Nos. 278-280). Tomarchio attests that when Plaintiff saw his mental health counselor on February 7, 2013, he reported that he was taking all of his medications as prescribed and was not having any side effects. See also Medical Records (Encounter No. 282). On February 28, 2013, it was noted that Plaintiff had been placed on Nutraloaf because he had thrown his food tray, that Plaintiff did not have any medical reason not to be on Nutraloaf, and that Plaintiff had said that he was allergic to eggs. See also Medical Records (Encounter No. 287).

Plaintiff returned to the SMU sick call on March 14, 2013 with complaints of stomach pains. Plaintiff reported that he drank Maalox daily, and requested abdominal testing for ulcers. Plaintiff was instructed by the nurse to continue using Maalox as needed and forwarded his request for abdominal testing to Mitchell-Hamilton, who ordered followup if Plaintiff showed no improvement. See also Medical Records (Encounter No. 292). Tomarchio attests that on April 23, 2013 Plaintiff was still complaining about abdominal pain. It was noted that Plaintiff was taking Prilosec, and that he wanted to go on a vegetarian diet. On examination the nurse found that Plaintiff had athletes foot, and she advised Plaintiff to consult with the Chaplain if he wanted a vegetarian diet. Mitchell-Hamilton ordered followup if Plaintiff's symptoms persisted. See also Medical Records (Encounter No. 299). When Plaintiff was seen by his mental health counselor on April 30, 2013, he denied any side effects from his medications. See also Medical Records (Encounter No. 303).

Tomarchio attests that on May 16, 2013 Plaintiff told the evening pill line staff that his Buspar and Geodon were upsetting his stomach, so they were discontinued. Plaintiff also said



he had acid reflux and that a lot of times the cafeteria food was too greasy.  See also Medical Records (Encounter No. 306).  Plaintiff thereafter returned to sick call on June 11, 2013, complaining about weight loss and that his abdomen was still burning.  Plaintiff was examined by the nurse, his weight was 138 pounds, and he was referred to the nurse practitioner.  See also Medical Records (Encounter No. 308).  Tomarchio attests that on June 15, 2013 Plaintiff complained that he was unable to breathe and had abdominal pain, which a correctional officer reported to the medical office.  Plaintiff was instructed by a nurse to take Mylanta; however, he refused to take any Mylanta and later refused to come to the medical office to sign a refusal form because he no longer needed treatment.  See also Medical Records (Encounter No. 309).  Plaintiff was thereafter evaluated by Mitchell-Hamilton on June 18, 2013, where Plaintiff complained of a poor appetite, that everything burns his stomach, and that he throws up.  It was noted that Plaintiff had been switched from Zantac to Prilosec because he complained Zantac burned his stomach.  He weighed 139 pounds.  Tomarchio attests that Mitchell-Hamilton diagnosed GERD and ordered lab work and a GI consult for evaluation of persistent nausea and vomiting and epigastric pain.  Mitchell-Hamilton followup with the Plaintiff on July 12, 2013 to discuss his lab results, at which time she also ordered some Zofran.  See also Medical Records (Encounter Nos. 310 and 315).

Plaintiff was evaluated in the GI clinic on August 30, 2013 and was diagnosed with GERD[9] and abdominal pain.  An EGD was ordered.  See also Medical Records (Encounter No. 326).  A few days later (September 3, 2013) Plaintiff was seen by the nurse after complaining of chest pain, nausea and sharp stomach pains after eating a meal.  On examination Plaintiff was found to weigh

---

[9]Which Dr. Tomarchio notes was the same diagnosis that had been made by SCDC medical staff for the past year.



144 pounds.  He was provided with some Zofran.  See also Medical Records (Encounter Nos. 326 and 327).

Tomarchio attests that on September 13, 2013 Plaintiff presented to medical complaining about stomach problems with dizziness and vomiting since taking Prilosec and Zantac. Plaintiff was examined by the nurse (during which he was found to weigh 147 pounds) and was told to take antacid.  The nurse referred the matter to the doctor, and Plaintiff was again instructed about what foods to avoid eating.  The Encounter Notes indicate that Plaintiff's Prilosec was discontinued by another SCDC doctor.  See also Medical Records (Encounter No. 330).  Plaintiff thereafter had his EGD on September 27, 2013, with the endoscopy showing gastritis.  See also Medical Records (Encounter Nos. 332, 334).

Tomarchio attests that on November 14, 2013 Plaintiff complained of an allergic reaction after eating mushrooms that were served in his meal.  Plaintiff was examined by a nurse, was noted to weigh 149 pounds, was diagnosed with "red hives", and was ordered some Benadryl. He was also placed in a holding cell for observation for one hour.  See also Medical Records (Encounter No. 341).  Plaintiff was then seen in sick call the next day for a followup with respect to his allergic reaction, with his condition noted to have resolved.  He weighed 148 pounds.  See also Medical Records (Encounter No. 342).

Dr. Tomarchio attests that on November 17, 2013 Plaintiff demanded to be seen by medical because he was having blood in his stool.  Plaintiff also reported that he had swallowed pieces of a razor blade, and the on call nurse practitioner ordered him placed on crisis intervention and to be evaluated the next morning by mental health and medical.  Mitchell-Hamilton ordered an x-ray of Plaintiff's abdomen on November 18, 2013, but that same day Plaintiff told a mental health

- 22 -



counselor that he had not swallowed razor blades and that he had flooded his cell to get medical to see him. He remained on crisis intervention status. See also Medical Records (Encounter Nos. 344 and 348). Two days later Plaintiff stated that he wanted to be seen by medical about his stomach pains, and said that he had a noose that he was going to use to harm himself if he was not seen by medical. Plaintiff specifically wanted some antibiotics. Tomarchio attests that Nurse Randolph forwarded the Encounter Notes for this event to Nurse Practitioner Mitchell-Hamilton, who ordered the nurse to check Plaintiff's x-ray results. A psychiatrist also ordered Plaintiff released from crisis intervention so that he could be seen by medical. See also Medical Records (Encounter Nos. 354 and 355). Plaintiff was then seen by a nurse in the SMU sick call the following day for his complaints of bowel pains and blood in his stool. Plaintiff also complained of sometimes having a burning sensation when urinating. Although he also claimed he had weight loss, he weighed 145 pounds. Plaintiff wanted Phenergan instead of Zofran, and also wanted to be given some antibiotics. The nurse requested a followup with Nurse Practitioner Mitchell-Hamilton, who ordered a followup appointment for the Plaintiff after reviewing the EGD results. See also Medical Records (Encounter No. 358).

Tomarchio attests that Mitchell-Hamilton then examined the Plaintiff for all of his complaints on December 4, 2013, at which time Plaintiff weighed 149 pounds. Plaintiff's prescription for Prilosec was increased, and a followup appointment with the GI clinic was made. A separate entry noted that Plaintiff's EDGI biopsy was negative for H. Pylori, and indicated he had "minimal" chronic gastritis. See also Medical Records (Encounter Nos. 361-362). Tomarchio attests that Plaintiff was thereafter seen for his followup appointment at the GI clinic on January 7, 2014, with the doctor recommending that Plaintiff take multivitamins once daily and that he have



a colonoscopy, See also Medical Records (Encounter No. 368). On January 31, 2014, Plaintiff was given permission to obtain a copy of his mental health records. See also Medical Records (Encounter No. 373).

Tomarchio attests that on February 4, 2014, Plaintiff complained that he was losing too much weight, even though he weighed 150 pounds. The Encounter Note also indicates that Plaintiff was complaining that although the GI doctor had recommended he take vitamins, that he had not been able to buy them in the canteen since he was at that time in lockup. Plaintiff also wanted double portions of food, even though Plaintiff's weight in December was 154 pounds. Nurse Randolph forwarded the matter to the Nurse Practitioner, and Plaintiff was placed on Nutraloaf on February 6, 2014. See also Medical Records (Encounter Nos 375 and 376). Plaintiff's colonoscopy revealed the presence of only internal hemorrhoids, and he was told to follow up in the GI clinic as needed. See also Medical Records (Encounter No. 377).

Tomarchio attests that Plaintiff was again seen by medical on March 11, 2014, complaining of severe abdominal pain and vomiting. On examination Plaintiff's abdomen was found to be non-tender and distended, and he had bowel sounds present in all four quadrants. Plaintiff was otherwise noted to be in no acute distress, and the Encounter Note indicates that by the end of the assessment, Plaintiff was laughing and at ease. See also Medical Records (Encounter No. 388). However, on March 13, 2014 Plaintiff returned to medical complaining of burning pains in his stomach, as well as that he was vomiting and passing blood from his rectum. Plaintiff was examined by the nurse, who did not find any problems. It was noted that Plaintiff weighed 145 pounds. The matter was forwarded to the Nurse Practitioner. See also Medical Records (Encounter No. 389).



Tomarchio attests that in March 2014 Plaintiff was transferred to the Perry Correctional Institution, where he was seen in the medical office on March 28, 2014 for numerous complaints. Tomarchio attests that Plaintiff was examined by a nurse, who found that he weighed 145 pounds and confirmed his medications. Tomarchio attests that Plaintiff thereafter returned to the medical office on April 3, 2014 complaining about his internal hemorrhoids, chronic gastritis, and needing double portions of food for weight loss (even though he weighed 147 pounds). Plaintiff was examined by the nurse and given some suppositories, Colace, and an ointment. See also Medical Records (Encounter Nos. 395 and 398).

Tomarchio attests that on April 7, 2014 a correctional officer found Plaintiff unresponsive in his cell. Officers assisted Plaintiff in his ambulation to the medical office, where although Plaintiff reported being dizzy and lightheaded, his gait was found to be steady and he was noted to be in no acute distress. After an examination, Plaintiff was scheduled for a followup appointment. See also Medical Records (Encounter No. 399). Tomarchio attests that on April 14, 2014, Plaintiff complained about receiving a vegetarian food tray instead of a regular tray. Plaintiff said he was supposed to get a regular tray with a substitute for eggs, to which he was allergic. Plaintiff was examined by the nurse and advised not to eat the eggs if they were on his food tray. He was found to weigh 142 pounds, and Fiberlax was ordered by a doctor. Plaintiff was subsequently seen by a Nurse Practitioner on April 24, 2014, where he complained about internal hemorrhoids. It was noted that Plaintiff did not like the Fiberlax, so it was discontinued, and he was prescribed Miralax. See also Medical Records (Encounter Nos. 402 and 404). On May 9, 2014, Plaintiff complained of nausea and vomiting during the morning pill line. Plaintiff was assessed by the nurse and instructed to drink fluids and rest. See also Medical Records (Encounter No. 407).



Tomachio attests that on May 19, 2014, Plaintiff presented to sick call with complaints of gastritis. He weighed 144 pounds. Plaintiff reported that his stomach was burning and he wanted some Tums to keep on his person so he could take them as needed. Plaintiff was told that the medical office did not have Tums for inmates to take as needed. See also Medical Records (Encounter No. 415). Plaintiff's medical records reflect that over the remainder of May 2014 Plaintiff had various complaints about his dinner trays, and that on May 26, 2014 he was told he would get a diet food tray because there were too many foods on the regular tray that contained eggs, to which he claimed to be allergic. The Encounter Notes reflect that this made Plaintiff unhappy because he wanted to receive the regular diet tray, minus the eggs. The Nurse Practitioner ordered some allergy testing. See also Medical Records (Encounter Nos. 415-418). Tomachio attests that on June 6, 2014 Plaintiff was evaluated for his complaints of blood in his stool, gastritis, that his Prilosec was not working, that he needed a special diet with low acids and no onions because of his gastritis, and that he also needed to be treated for anemia. On examination the nurse found no abnormalities, and that he weighed 144 pounds. An appointment was scheduled with the Nurse Practitioner. See also Medical Records (Encounter No. 420). A subsequent entry notes that Plaintiff's allergy test for eggs was negative. See also Medical Records (Encounter No. 424).

Tomarchio attests that on June 18, 2014 Plaintiff complained of chest pain to a correctional officer, who was instructed by the nurse to offer Plaintiff some Mylanta and Ibuprofen. Plaintiff was then examined by the Nurse Practitioner the following day, at which time he wanted to by checked for H. Pylori as well as thyroid cancer. Plaintiff also wanted a new diet for chronic gastritis. The Encounter Note reflects that Plaintiff was provided some Maalox to keep on hand, and that his stool was to be check for H. Pylori antigen. The Nurse Practitioner also ordered that Plaintiff



be given a heart heathy diet.  See also Medical Records (Encounter Nos. 427 and 428).

Tomarchio attests that Plaintiff returned to sick call on June 30, 2014 complaining of continued burning and sharp pain in his abdomen, that the Prilosec was not working, and that he wanted some Nexium and Maalox.  Plaintiff also complained that the heart healthy diet hurt his stomach, and now indicated that he wanted eggs on his food tray.  It was noted the lab results showed that Plaintiff did not have H. Pylori.  See also Medical Records (Encounter No. 433).  Tomarchio attests that on July 7, 2014 Plaintiff again complained that he wanted to be removed from the heart healthy diet, claiming that he was vomiting blood and "greasy vomitus" since he had begun eating a diet food tray.  Plaintiff was examined by the nurse, who found nothing abnormal, and he signed a refusal to eat the heart healthy diet.  Plaintiff was also referred to the Nurse Practitioner, who evaluated Plaintiff on July 20, 2014.  Plaintiff also complained to the Nurse Practitioner about the heart health diet and that he now wanted a "bland diet".  It was noted that Plaintiff weighed 147 pounds and was maintaining his weight.  Plaintiff was referred to the GI clinic.  See also Medical Records (Encounter Nos. 434 and 440).

Tomachio attests that on July 7, 2014 Plaintiff was placed on crisis intervention after indicating that he felt suicidal.  He also declared he was on a hunger strike (he weighed 142 pounds at that time), and the Encounter Notes show that the protocol for a hunger strike was initiated. Tomachio attests, however, that Plaintiff changed his mind about the hunger strike the following day, telling his mental health counselor that he went on crisis intervention because medical was ignoring him.  Although the Encounter Notes reflect that the mental health counselor recommended Plaintiff come off crisis intervention, he was placed back on crisis intervention on August 10, 2014 after he indicated he wanted to kill himself, but was then removed from crisis intervention the following day



after indicating he had used crisis intervention to get out of his cell.  See also Medical Records (Encounter Nos. 445-448, 453-455).

Tomarchio attests in conclusion that from May 31, 2012 to August 14, 2014, Plaintiff had two hundred thirty-five (235) direct or indirect encounters with medical and mental health staff, and that although Plaintiff did not get all the medical care he wanted or requested, he was never denied the proper and necessary medical care for his problems.  Tomarchio attests that Plaintiff received and continues to receive medical care and treatment which includes, but is not limited to, medications, examinations, lab work, x-rays, GI procedures, counseling, special diets and specialty consults for all of his medical complaints, that Plaintiff has not experienced any serious or life threatening medical problems, nor has he had any emergent or urgent medical problems that required immediate or emergency care.  Tomarchio attests that medical staff provided Plaintiff with conservative care, and that when a problem persisted, the medical staff made treatment changes and referrals to specialists.  Tomarchio further attests that the non-medical Defendants in this lawsuit, including the Defendants Barber, Sterling, Stevenson and Montgomery, were never involved in Plaintiff's medical care and treatment, did not make any decisions regarding Plaintiff's care and treatment, and did not deny Plaintiff access to care and treatment.  See generally, Tomarchio Affidavit, with attached Exhibits (Medical Records).

As noted, Plaintiff has submitted several hundred pages of exhibits as an attachment to his memorandum opposing summary judgment.  These exhibits include many of the same medical records which have been submitted by the Defendants, and which are discussed hereinabove, supra.  Plaintiff has also submitted a copy of an article on gastritis (apparently from the National Institutes of Health), a printout from the internet about the drug Prilosec, a printout from the internet relating



to the drug Nexium, an internet printout relating to the drug Aciphex, an internet printout relating to the drug Capidex, an internet printout relating to the drug Protonix, and an internet printout relating to the drug Prevacid.  Plaintiff has also submitted copies of numerous physician transfer notes, records from the Berkeley Endoscopy Center and from the pathologist (showing Plaintiff to be negative for H. pylori and that he had been diagnosed with only a "minimal chronic gastritis"), a copy of Plaintiff's medication administration records (which show that Plaintiff receives a wide variety of medications on a regular basis), a copy of what purports to be portions of the SCDC Grievance Policy as well as copies of numerous grievances and Requests to Staff Member forms Plaintiff has submitted at various times, copies of responses to discovery requests Plaintiff received from the Defendants, a copy of Dr. Tomarchio's Affidavit (on which Plaintiff has underlined various sentences and paragraphs), copies of various sick call request forms wherein Plaintiff makes numerous requests for different types of care and attention, and a copy of a "hot line" message Plaintiff purportedly left with the SCDC on November 19, 2014 together with a response from the Regional Nurse Manager

Plaintiff has also provided two affidavits from himself, as well as an affidavit from fellow inmate Vincent Newman.  Newman attests in his affidavit that "[s]ince living on the same wing with [Plaintiff] I have heard him complain to the nurses several times about the foods that he is not supposed to eat due to his condition."  Newman also attests that he was himself on the healthy heart diet at some point, and that this diet has "all of the foods in it that [Plaintiff] expressed to the medical staff that he is not supposed to eat".  Finally, Newman attests that on February 5, 2015, he overheard the Plaintiff speaking with "Sgt. Rivera" pertaining to Nurse Practitioner "Enloe" telling him that he could no longer go to sick call to complain about gastritis because "it is abusive".  See



generally, <u>Newman Affidavit</u>.

        In an affidavit dated March 12, 2015, Plaintiff essentially reiterates the allegations of his verified Complaint and discusses how some of the encounter entries noted in his medical records are "irrelevant". In his second affidavit, which is dated February 11, 2015, Plaintiff attests that on February 5, 2015 he was taken from his cell to see Nurse Enloe about his medical problems, and that he was informed by Nurse Enloe that he complained too much and needed to stop coming to sick call because he was abusing the system. Plaintiff attests that he informed Nurse Enloe that his illness is chronic and that he will come to sick call as he needs to. Plaintiff attests that he also told Nurse Enloe that he had not been "pull[ed]" to see medical at least five or six times when he had requested to be seen, and that Enloe informed him that he had not been pulled on those occasions because his "issues [were] being addressed already . . . .". Plaintiff further attests that Enloe told him that "medical will not keep seeing no one for the same issue(s) over and over its abuse of sick call to keep coming to sick call like that". Plaintiff attests that Enloe further informed him that the reason he had not been taken off Nexium was because she had already placed him on it and because he complained too much about being on Prilosec. <u>See</u> generally, <u>Plaintiff's Affidavits</u>.

<u>**Discussion**</u>

        Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion

- 30 -



with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Here, after careful review and consideration of the arguments and evidence presented, the undersigned finds and concludes for the reasons set forth hereinbelow that the Defendants are entitled to summary judgment in this case.

In order to proceed with a claim for denial of medical care as a constitutional violation, Plaintiff must present evidence sufficient to create a genuine issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Farmer v. Brennen, 511 U.S. 825, 837 (1994); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975); Belcher v. Oliver, 898 F.2d 32 (4th Cir. 1990). Plaintiff has failed to submit any such evidence. Rather, the evidence before this Court, including Plaintiff's medical records as well as Plaintiff's own statements in his filings and exhibits, shows that Plaintiff received continuous and ongoing treatment for his medical complaints. He was regularly seen by nurses, nurse practitioners, as well as by at least two (2) doctors, including a specialist. His medical summary notes were also reviewed by physicians on a regular basis, as is clearly shown in the SCDC Health Services Medical Summaries. None of the medical evidence provided to this Court shows

- 31 -



that any named Defendant, or any other medical personnel, were deliberately indifferent to Plaintiff's

serious medical needs.  Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833

(N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows

of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer, 511 U.S. at 837;

House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations

insufficient to maintain claim].[10]

       Plaintiff's complaint is quite simply that the medical personnel referenced in his

---

      [10]Further, with respect to the Defendants Stevenson, Sterling, Barber and Montgomery, while public officials are subject to monetary damages under § 1983 in their individual capacities, the doctrines of vicarious liability and respondeat superior are not applicable in § 1983 cases.  See Vinnedge v. Gibbs, 550 F.2d 926, 927-929 & nn. 1-2 (4th Cir. 1977).  There is no evidence, or even any allegations, to show that any of these Defendants was responsible for Plaintiff's medical care. Stevenson was the Warden of the Institution, while Sterling was the Director of the Department of Corrections.  Neither is a physician, and they cannot be held liable for any medical decisions made by any of the prison medical personnel just because they are employees of the prison.  Supervisory officials may be held liable in a § 1983 action only for an official policy or custom for which they are responsible and which resulted in illegal action.  See generally, Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978); Wetherington v. Phillips, 380 F.Supp. 426, 428-429 (E.D.N.C. 1974), aff'd, 526 F.2d 591 (4th Cir. 1975); Joyner v. Abbott Laboratories, 674 F.Supp. 185, 191 (E.D.N.C. 1987); Stubb v. Hunter, 806 F.Supp. 81, 82-83 (D.S.C. 1992);  See Slakan v. Porter, 737 F.2d 368, 375-376 (4th Cir. 1984), cert. denied, Reed v. Slakan, 470 U.S. 1035 (1985); Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 115 S.Ct. 67 (1994); Fisher v. Washington Metro Area Transit Authority, 690 F.2d 1133, 1142-1143 (4th Cir. 1982) (citing Hall v. Tawney, 621 F.2d 607 (4th Cir. 1980)).  No such policy or custom is shown in the evidence.  Rather, Plaintiff's complaint is that the medical personnel involved in his case did not make (in his opinion) the proper medical decisions about what should be done about his complaints.  See, discussion hereinabove, supra and infra.  Both Stevenson and Sterling were entitled to rely on the judgment and decisions made by the medical professionals who saw the Plaintiff with respect to Plaintiff's medical care, as were also the Defendants Barber (a food supervisor) and Montgomery (a grievance coordinator).  Cf. Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) [officials entitled to rely on judgment of medical personnel]; Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) [officials entitled to rely on expertise of medical personnel].  Hence, even if the Court were to find that Plaintiff's claims against the other named Defendants are sufficient to survive summary judgment, the Defendants Stevenson, Montgomery, Sterling and Barber would all be entitled to dismissal as party Defendants.



Complaint did not provide him with the type of medical care *he desired*, that he did not receive some

drugs he wanted while he did receive other drugs that he did not want, that sometimes he was not

seen immediately (as he wished to be) or was at times seen by nurses or the Nurse Practitioner when

he would have rather been seen by a physician, or in particular that he should have been sent to be

seen by a gastroenterologist sooner than he was.  However, it is clear in the evidence provided to this

Court (including Plaintiff's own documentary and testimonial exhibits) that the medical

professionals involved in Plaintiff's case evaluated Plaintiff's condition and rendered a judgment as

to the type of care and treatment warranted based on their professional experience and judgment, and

Plaintiff's mere lay disagreement with the opinions or diagnoses of these medical professionals,

without any contrary *medical* evidence to show that any medical professional violated the requisite

standard of care for his complaints, is not sufficient to maintain a §1983 deliberate indifference

lawsuit.  See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)[Disagreements between an inmate

and a physician over the inmate's proper medical care do not state a § 1983 claim absent exceptional

circumstances]; Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor

v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical

fitness, whether physical or mental; that is what independent medical experts are for."]); see also Hill

v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1188-1189 (11th Cir. 1994)["An inmate

who complains that delay in medical treatment rose to a constitutional violation must place verifying

medical evidence in the record to establish the detrimental effect of delay in medical treatment to

succeed"], overruled in part by Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002).

   While Plaintiff may not agree with the extent and nature of the medical care he

received, he cannot simply allege that he did not receive constitutionally adequate medical care or



attention, otherwise provide no supporting evidence, and expect to survive summary judgment, particularly when not only the Defendants but *even the Plaintiff himself* have submitted medical documents, an expert opinion from Dr. Tomarchio, and other evidence showing that Plaintiff was regularly seen and evaluated by medical personnel for his complaints, and which refute Plaintiff's claim that medical personnel were deliberately indifferent to his serious medical needs.  Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim]; Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; Levy, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"].

   Plaintiff may, of course, pursue a claim in state court if he believes that the medical care provided to him constitutes malpractice.  However, that is not the issue before this Court. Estelle v. Gamble, 429 U.S. 97, 106 (1976)["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."].  The evidence before the Court is insufficient to raise a genuine issue of fact as to whether any named Defendant was deliberately indifferent to Plaintiff's serious medical needs, the standard for a constitutional claim, and Plaintiff's federal § 1983 medical claim should therefore be dismissed.  See DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; Baker v. McClellan, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care]; Estelle, 429 U.S. at 106 ["medical malpractice does

- 34 -



not become a constitutional violation merely because the victim is a prisoner."].

### **Conclusion**

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

April 7, 2015
Charleston, South Carolina



– 35 –

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4ᵗʰ Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

– 36 –
